IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,            :
                                     :
        Plaintiff,                   :
                                     :
    v.                               : Criminal Action No. 08-126-JJF
                                     :
JIMMY LEE PIERCE,                    :
                                     :
        Defendant.                   :

Edward McAndrew, Esquire, Assistant United States Attorney, Attorney for Plaintiff.

Luis A. Ortiz, Esquire, Assistant Federal Public Defender, Attorney for Defendant.

**MEMORANDUM OPINION**

February 2, 2009
Wilmington, Delaware

*Joseph J. Farnan Jr.*
Farnan, District Judge.

Presently before the Court is Defendant's Motion to Suppress Evidence. (D.I. 15) Specifically, Defendant seeks to suppress approximately one kilogram of cocaine, over $20,000 in cash, and other physical evidence seized from a vehicle during a traffic stop on July 15, 2008. Defendant also seeks to suppress statements he made to police during the stop.

## I. Background

During the afternoon of July 15, 2008, Corporal Douglas Brietzke of the Delaware State Police observed Defendant's vehicle, a Chevrolet Lumina, traveling southbound on Interstate 95. Cpl. Brietzke observed Defendant's vehicle leading a pack of cars by about five car-lengths. As the cars passed Cpl. Breitzke's position, Defendant's vehicle maintained its lead and seemed to be pulling slightly away from the other cars. Based on Cpl. Breitzke's knowledge of the average speed of vehicles in that area, he believed that Defendant might be exceeding the speed limit. Therefore, Cpl. Breitzke pulled out into traffic and began to follow and pace the speed of Defendant's vehicle.[1]

---

[1] Cpl. Brietzke's police vehicle had a speedometer that was calibrated by stopwatch on May 17, 2007, about one month before Defendant was stopped. The vehicle's speedometer was calibrated again on June 23, 2007, about one week after the stop. The calibration, accurate to within 0.01 seconds, showed that the vehicle's speedometer was approximately 0.8 miles per hour faster than the vehicle's actual speed.

1

Cpl. Breitzke paced Defendant's vehicle by following approximately three car-lengths to the rear. Once in position to pace, Cpl. Breitzke observed a distinct change in Defendant's driving behavior. Defendant slowed and made a lane change to the right, slightly away from Cpl. Breitzke's position. Defendant slowed to a point where the traffic that he had previously been leading was now passing him. At this point, Cpl. Breitzke paced Defendant's vehicle at 55 miles per hour on an area of highway with a 55 mile per hour speed limit.

As the pace continued, the speed limit changed to 40 miles per hour, and Defendant's vehicle slowed to 45 miles per hour, five miles per hour over the limit. Approaching a toll booth, the speed limit changed to 25 miles per hour, and Defendant's vehicle slowed to 35 miles per hour, ten miles per hour over the limit. After Defendant's vehicle exited the toll booth, Cpl. Breitzke commenced a traffic stop of Defendant's vehicle for speeding. The ensuing traffic stop was recorded by a camera mounted on the dashboard of Cpl. Brietzke's vehicle. The Court reviewed this video during the evidentiary hearing on November 18, 2008.

During the stop, Cpl. Brietzke observed stains, trash, papers, and discarded food wrappers in the passenger seat area of Defendant's car, giving the car a "lived-in look." He also observed many cell phones and small electronic devices, mostly disassembled, sitting in the passenger seat, along with an open box

of No-Doz and a pack of Vibrin.  Bird seed and children's toys were scattered in the back seat.

When Cpl. Brietzke asked Defendant for his license, registration, and insurance information, Defendant produced a license and told Cpl. Breitzke that the car was rented, and therefore, he did not have the registration or insurance information.  Given the condition of the vehicle's interior, Cpl. Breitzke decided to further question the Defendant about the rental.  When asked, Defendant claimed that his girlfriend had rented the car, and that he had not been present when it was rented.

Cpl. Breitzke asked Defendant where he was going, and Defendant responded that he was returning from dropping off his sister in Harlem.  When Cpl. Brietzke asked about the clutter in the passenger seat, Defendant responded that those items were not in the seat earlier, when his sister was riding in the car.

After this questioning, Cpl. Brietzke asked Defendant to get out of the vehicle and come to the rear of the car, where Cpl. Breitzke conducted a pat-down search for weapons.  When Defendant got out of the car, he left the driver's door open.  During the pat-down search, Cpl. Brietzke felt "what [he] believed to be paper money," which Defendant then pulled out of his pocket to show to Cpl. Breitzke.  The money was folded into several stacks of cash, which Defendant explained was to allow for faster counting.  Based

3

on his experience and training, Cpl. Brietzke was aware that stacks of cash folded in this manner were the product of illegal drug transactions.

Without a request by Cpl. Brietzke, Defendant also removed a rental agreement from his pocket and showed it to Cpl. Breitzke. The agreement, however, was for a different vehicle rented to a woman that Defendant identified as his girlfriend. When Cpl. Brietzke asked for the name of Defendant's girlfriend, Defendant hesitated for a moment before answering "T." Defendant then said her first name was "Tamara." Defendant was not able to recall her last name during this exchange. Defendant also contradicted his earlier statement about whether he was present when the car was rented. Cpl. Brietzke returned the money and rental agreement to Defendant and instructed Defendant to sit by the side of the road while Cpl. Brietzke checked the status of Defendant's license.

While Cpl. Brietzke checked Defendant's license information, another trooper, Cpl. Alison Meadows, arrived with her canine partner, Cole. At the hearing, Cpl. Meadows testified about her training and experience with Cole. Cole received special and continuing training to alert at the scent of certain illegal narcotics, including cocaine. Cpl. Meadows was trained to identify and interpret these alerts. Cpl. Meadows further testified that, in her experience with Cole, less than one third of Cole's alerts were "false" alerts where no narcotics were found. Cpl. Meadows testified that more than two thirds of the time when she identified

4

a positive alert by Cole a subsequent search revealed illegal narcotics.

Cpl. Meadows testified that she gave Cole the command to sniff Defendant's vehicle and then walked him around the vehicle's exterior. The front-passenger window was partially open, and Cole alerted at the window by excitedly jumping up and sniffing the dashboard of the vehicle's interior. Cole poked his nose through the partially open window but did not enter the car. Cole's behavior and reactions at this point indicated to Cpl. Meadows that he had positively alerted to the smell of potential illegal narcotics in the vehicle. Cpl. Meadows then gave Cole more freedom to sniff around the car by loosening the slack on his leash.

As Cpl. Meadows and Cole approached the driver's side of Defendant's vehicle, Cole quickly hopped through the open driver's door and began sniffing the interior of the car. Cpl. Meadows did not direct Cole into the vehicle, but he entered it on his own. While in the vehicle, Cole again alerted to the passenger seat and dashboard area by excitedly scratching and sniffing. Cpl. Meadows testified that, through her training and experience, she understood Cole's actions were a response to narcotics and not to other items. Cole then jumped into the back seat of Defendant's car, where he began rummaging through the bird seed and other items laying there. Cpl. Meadows identified this behavior as a response to food and removed Cole from the vehicle.

Cpl. Meadows informed Cpl. Brietzke of Cole's alert to the passenger seat and dashboard area of the car. Without Defendant's consent, the two officers then began to search the vehicle. They opened the glovebox on the passenger's side and found approximately one kilogram of cocaine and over $20,000 in cash. After this discovery, Defendant was arrested.

## II. Discussion

Defendant contends: 1) that Cpl. Brietzke lacked justification for the initial traffic stop, and therefore all evidence seized during the stop should be suppressed as the fruits of an illegal search and seizure under the Fourth Amendment; 2) that Cpl. Brietzke conducted a custodial interrogation of Defendant without a valid waiver, as required by Miranda v. Arizona, and therefore Defendant's statements to Cpl. Brietzke should be suppressed as a violation of the Fifth Amendment; 3) that the canine sniff of Defendant's car, supervised by Cpl. Meadows, was an illegal search under the Fourth Amendment; and 4) that the officers' subsequent search of the car's glovebox was an illegal search under the Fourth Amendment. The Court finds no merit to these contentions.

### A. The Initial Traffic Stop

"An officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry v. Ohio, 392

6

U.S. 1, 30 (1968)). Although the reasonable suspicion requirement is a "less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence," it nonetheless requires an officer to articulate an "objective justification for making the stop." Id. (citing United States v. Sokolow, 490 U.S. 1, 7 (1989)). Specifically, in the context of motor vehicle stops, courts have held that a stop is lawful where the officer has reasonable suspicion that either the motorist or the vehicle are in violation of the law. United States v. Delfin-Colina, 464 F.3d 392, 397 (3d Cir. 2006).

In this case, Cpl. Brietzke testified that he observed Defendant traveling at 45 miles per hour in an area with a 40 mile per hour speed limit, then traveling at 35 miles per hour in an area with a 25 mile per hour speed limit, thereby committing a traffic violation. Having observed Defendant commit this traffic violation, Cpl. Brietzke was justified in stopping Defendant. See, e.g., Whren v. United States, 517 U.S. 806, 810 (1996) ("[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred").

**B. Custodial Interrogation**

As explained in Miranda v. Arizona, 384 U.S. 436 (1966), statements made by a defendant during custodial interrogation by police are inadmissible unless the officers inform the defendant of the rights enumerated in Miranda and obtain an effective waiver of those rights. See Berkemer v. McCarty, 468 U.S. 420, 429 (1984).

It is the intimidating nature of custodial interrogation that warrant the safeguards of Miranda. A typical traffic stop, however, is more analogous to a so-called "Terry stop" than to custodial interrogation. Id. at 439-40 (citing Terry v. Ohio, 392 U.S. 1, 88 (1968)). "[T]his means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." Id. Accordingly, absent other evidence indicating a coercive custodial atmosphere, persons temporarily detained pursuant to ordinary traffic stops are not considered "in custody" for the purposes of Miranda. Id. at 440. Furthermore, during such a traffic stop, a police officer may conduct a limited weapon pat-down of the vehicle's occupants when those occupants engage in suspicious behavior, such as furtive movements. Michigan v. Long, 463 U.S. 1032, 1047 (1983); Pennsylvania v. Mimms, 434 U.S. 106 (1977) (per curiam); U.S. v. Moorefield, 111 F.3d 10, 13-14 (3d Cir. 1997).

In this case, Cpl. Brietzke stopped Defendant for speeding and asked Defendant for identifying information. Defendant's response to this request was not protected by the safeguards of Miranda. When Defendant claimed the vehicle was a rental, despite its appearance, and could not produce any documentation to support this claim, Cpl. Brietzke's suspicion and detention of Defendant long enough to ask clarifying questions was certainly reasonable. Cpl. Brietzke's questions sought to clarify Defendant's claim that he

had rented the vehicle, where he was going, and why he did not have the expected documentation. At no point did Cpl. Brietzke exceed the bounds of a permissible detention under Terry, and therefore the Court concludes that Defendant's statements in response to Cpl. Brietzke's questions were voluntary.

Finally, in view of the condition of the inside of Defendant's vehicle and Defendant's inconsistent and vague answers, Cpl. Brietzke was justified in asking Defendant to exit the vehicle and submit to a brief pat-down search for weapons. During the pat-down and without a request by Cpl. Brietzke, Defendant voluntarily produced the cash and a rental agreement from his pockets. The Court finds that the production of these items by Defendant was not compelled. The Court finds the stopping and detaining of Defendant continued for a reasonable amount of time sufficient for Cpl. Brietzke to ask pertinent questions and to verify Defendant's information, and, therefore, Cpl. Brietzke was not required to provide Defendant with Miranda warnings.

In sum, the Court concludes that Defendant's statements during the traffic stop, up to the moment when the officers discovered cocaine in his car, were voluntary and are admissible.

**C. The Canine Sniff**

During the traffic stop, the sniffing of a vehicle's exterior by a trained drug-sniffing canine is not a search within the meaning of the Fourth Amendment, even absent any suspicion that the vehicle contains contraband. Illinois v. Caballes, 543 U.S. 405,

9

409-10 (2005) ("A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment."); Indianapolis v. Edmond, 531 U.S. 32, 40 (2000). See United States v. Lyons, No. 05-3099, 2006 U.S. Dist. LEXIS 14454, *11-21 (D.Neb. Feb. 15, 2006) (upholding a dog sniff where the dog's nose penetrated the vehicle's open window, even where officer directed dog to sniff window area, finding that the dog detected the odor of drugs while outside the vehicle and the act of sticking its head inside the car was not directed by the handler but was "initiated by the dog himself"). In this case, Cpl. Brietzke verbally engaged Defendant during the traffic stop and detained Defendant for follow-up questioning. In these circumstances, the Court concludes that Cole's sniff of the exterior of Defendant's vehicle during the stop and questioning, including Cole's sniff at the open front-passenger window, was not a search within the meaning of the Fourth Amendment.

After viewing the video of the traffic stop and considering the testimony of Cpl. Meadows, the Court notes that Cole's sniff at the front-passenger window was relatively brief. His behavior appeared to change only for a moment. Cpl. Meadows testified that Cole's reaction, especially putting his paws on the vehicle, was a positive alert. The Court credits Cpl. Meadows' testimony, given her training and experience with Cole.

The more difficult question is whether the sniff became an unlawful search, within the meaning of the Fourth Amendment, when Cole jumped through the open driver's door and began sniffing the vehicle's interior. Neither the Supreme Court nor the Third Circuit have addressed the question of whether an otherwise lawful exterior canine sniff transforms into a search if the dog, entirely of its own accord, jumps into a vehicle. However, the Court of Appeals for the Tenth Circuit and a District Court in this Circuit have addressed this question. United States v. Stone, 866 F.2d 359, 363-64 (10th Cir. 1989); United States v. Hutchinson, 471 F.Supp.2d 497, 505-10 (M.D.Pa. 2007). Both courts concluded that a dog sniff inside a vehicle does not violate the Fourth Amendment if the dog enters the vehicle voluntarily, because the dog is an animal acting on instinct and is not itself a state actor. See, e.g., Hutchinson, 471 F.Supp.2d at 507-08. Courts have reasoned, however, that if an officer places the dog in the vehicle, orders the dog into the vehicle, or otherwise facilitates the dog's entry, such as by opening a door, then that action by the officer would transform the sniff into a search. See, e.g., id. at 508; United States v. Winningham, 140 F.3d 1328, 1331 (10th Cir. 1998) (suppressing contraband discovered in a van following a canine sniff, where officers opened the van's door to facilitate the canine search).

The Court is persuaded by the reasoning provided by the Hutchinson case. The facts of that case are similar to the facts

of this case. In Hutchinson, the defendant was stopped after an officer observed him failing to signal when making an abrupt turn. 471 F.Supp.2d at 499. In response to the officer's questions, the "Defendant responded with a story that was 'very, very questionable.'" Id. at 500. The officer asked the defendant to exit the vehicle. Id. at 499-500. A drug-detecting canine named Zeus sniffed the vehicle's exterior then jumped through an open window and alerted on a duffle bag in the back seat. Id. After considering the case law regarding these types of canine sniffs, the court concluded that the dog's instinctive action, unprompted and unassisted by police officers, did not constitute a search under the Fourth Amendment. Id. at 505-10.

Here, the Court concludes that Cole's entry through the open driver's door did not transform his sniff into a Fourth Amendment search. Cole entered the vehicle through a door that Defendant left open. Cpl. Meadows did not push, direct, or order Cole into the vehicle. Rather, the record evidence establishes that Cole entered the vehicle on his own and alerted to the passenger's side and dashboard area of the vehicle.

Accordingly, the Court concludes that the canine sniff of both the exterior and interior of Defendant's vehicle was not a search within the meaning of the Fourth Amendment.

**D. The Search By The Officers**

The Court credits Cpl. Meadows' testimony that she interpreted Cole's behavior as a positive alert for illegal narcotics. Cole

12

twice alerted to the passenger seat and dashboard area of Defendant's vehicle.  Thus, the Court concludes that the officers had probable cause to search that area of Defendant's vehicle, including opening the glovebox, pursuant to the automobile exception to the warrant requirement.  <u>California v. Acevedo</u>, 500 U.S. 565, 579-80 (1991).  Accordingly, the Court concludes the officers' search of the passenger area was lawful, and the evidence obtained is admissible.

### III. Conclusion

For the reasons set forth above, Defendant's Motion to Suppress (D.I. 15) will be denied.  An appropriate Order will be entered.